UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIC ANTRUM,

    Plaintiff,

    v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

    Defendant.

Civil Action No. 08-0203 (JDB)

## MEMORANDUM OPINION

Plaintiff Eric Antrum, a Special Police Officer employed by defendant Washington Metropolitan Area Transit Authority ("defendant" or "WMATA"), brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.[1] Antrum contends that defendant discriminated against him on the basis of his race (African American) by applying its "no beard" policy to him (Count 3), and then retaliated against him when he sought redress through the EEOC (Count 1). Presently before the Court is defendant's motion for summary judgment. Upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, the Court will grant defendant's motion.[2]

---

[1] The complaint also alleges violations of the D.C. Human Rights Act and 42 U.S.C. § 1981. Defendant previously filed an unopposed motion to dismiss those claims, and the Court dismissed them (Counts 2, 4, 5, and 6) on May 8, 2008. See Minute Order (filed May 8, 2008).

[2] For ease of reference, the Court will refer to defendant's memorandum in support of its motion for summary judgment and defendant's reply as "Def.'s Mem." and "Def.'s Reply," respectively, and to plaintiff's opposition to defendant's motion for summary judgment as "Pl.'s Mem." The Court will refer to the exhibits attached to the parties' motions as "Def.'s Exhibits" and "Pl.'s Exhibits."

## BACKGROUND

Antrum is a Special Police Officer ("SPO") with WMATA's Metro Transit Police Division ("MTP"). Pl.'s Ex. 1, ¶ 2 (Declaration of Eric Antrum) ("Pl.'s Decl."). The MTP policy on facial hair -- MTP General Order No. SPO-225 -- provides that "[e]xcept for a moustache, on-duty SPO's will be clean shaven," but makes an exception for employees diagnosed by a dermatologist as having pseudofolliculitis barbae ("PFB"). See Def.'s Ex. 2, at 1-2 ("General Order No. SPO-225"). This exception provides as follows:

> SPO's diagnosed by a private dermatologist as having pseudofolliculitis barbae (PFB), upon compliance with the following requirements, will be permitted to grow a well trimmed symmetrical beard. . . .
>
> (1) After obtaining a certificate from a private dermatologist and prior to growing a beard, the member will contact the Administrative Captain . . . who will schedule an examination by a WMATA physician.
>
> (2) SPO's responding to the WMATA Medical Office will present the dermatologist's certificate and a Pseudofolliculitis Barbae Verification Form (MPT Form #124).
>
> (3) If the WMATA physician disagrees with the diagnosis of the private dermatologist, the member will continue to shave.
>
> (4) If the WMATA physician agrees with the diagnosis of the private dermatologist and completes the MTP #124, the original copy of same and the dermatologist's certificate will be returned to the Administrative Captain . . . who will . . . notify the member's section commander.

Id. at 1-2.

On May 11, 2005, Antrum's supervisor, Lieutenant Metcalf, saw him wearing a beard at work and instructed him to shave. Pl.'s Decl. ¶ 5. The next day Antrum visited his physician's office and received a letter from a nurse stating that he had "folliculitis." Id. ¶ 6; Pl.'s Ex. 2 (nurse's letter stating that plaintiff has "a medical condition called folliculitis"). On or about May 17, Metcalf instructed Antrum to bring the letter to WMATA's Medical Office. Def.'s Stmt.

of Material Facts ¶ 6. Over a month passed before Antrum sought a PFB exception from his supervisors on June 30 and he submitted the nurse's letter to WMATA's Medical Office on July 1. Pl.'s Decl. ¶¶ 7-8. When Antrum presented the nurse's letter to the Medical Office, he was informed that the letter was not adequate and that the certification must come from a dermatologist. Id. ¶ 8. Antrum states that he then shaved on July 2 because he "did not have the means to be referred to a specialist and get an appointment in time for my next scheduled shift." Id. ¶ 9. On July 11, Antrum filed an EEOC charge of racial discrimination against WMATA. Id. ¶ 10. The next month, on August 3, 2005, Antrum received his annual evaluation, which included a statement that "Antrum is not in compliance with his professional appearance. He has been counseled on his Facial Hair growth." Pl.'s Ex. 3, at 2. The written explanation in support of the overall rating -- "competent" -- stated:

> Officer Antrum is a dedicated employee who takes pride in his daily assignments. He's very reliable and dependable. He has not provided the proper documentation of his grooming standards. Deputy Chief Lee had to counsel him on his uniform appearance.

Id. at 6. Antrum characterizes this as a "negative performance evaluation," but on its face, the evaluation rated him "competent" overall and qualified him for a pay increase. See id. at 6; Def.'s Ex. 6 (record of Antrum's August 18 pay increase).

By April 2006, Antrum had again grown a beard. See Def.'s Ex. 7, at 1. The MTP began investigating Antrum's conduct on April 17, and concluded on April 24 that "Antrum is not and will not comply with Metro Special Police General Orders." Id. On May 1, 2006, Antrum was suspended for one day. Pl.'s Decl. ¶ 12. Antrum then amended his EEOC charge to include a charge of retaliation. Id. ¶ 13.

He eventually met with a dermatologist on September 12, 2006, who gave him a letter stating that he had "stage 3 pseudofolliculitis barbae." Id. ¶ 14; Pl.'s Ex. 4. Antrum waited until

November 1 to give the dermatologist's letter to the WMATA Medical Office, which on the same day approved the letter and completed the PFB verification form required by the General Order (MTP Form #124). See Pl.'s Decl. ¶¶ 14, 15; Pl.'s Ex. 5; Def.'s Stmt. of Material Facts ¶ 18. Antrum apparently delayed in presenting his superiors with MTP Form #124,[3] but by February 2007 he was allowed to wear his beard. See Def.'s Stmt. of Material Facts ¶ 18; Pl.'s Decl. ¶ 16.

The EEOC issued a decision on Antrum's charge on August 16, 2007. Pl.'s Ex. 6 ("EEOC Decision"). The EEOC stated that "the evidence establishes reasonable cause to believe that [WMATA] has committed multiple violations of Title VII" by "failing to grant [Antrum] a reasonable term and condition of employment." Id. at 2. The EEOC also concluded that WMATA "is administering an overly-bureaucratic policy that is subjecting a class of other similarly situated Black males with PFB to policies and practices which in essence result in a no-beard policy that has a significant negative adverse impact on Black males with PFB." Id. Finally, the EEOC found that WMATA retaliated against Antrum for his EEOC activity "through adverse employment evaluations, discipline, suspension and other term[s] and condition[s] of employment." Id. The EEOC did not provide Antrum with a remedial award, but merely "invite[d] the parties to join with it in reaching a just resolution." Id. at 3. This evidently did not occur.

Antrum then filed the instant suit on February 5, 2008. After the parties completed discovery, and the deadline for filing dispositive motions passed with no action by the parties, the Court set a trial date of September 20, 2010. However, newly assigned defense counsel then moved for leave to file a late motion for summary judgment. The Court granted the motion for

---

[3] Antrum declined to present the PFB verification form to his superiors earlier because he believed the diagnosis of PFB was medical information that he was entitled to keep private. See Pl.'s Depo. at 27-28 (Def.'s Ex. 1).

4

leave to file, finding that the arguments raised by WMATA warranted full consideration prior to a jury trial, and set a briefing schedule that provided plaintiff a month to respond. See Order at 1-2 (filed Jan. 6, 2010). Defendant's motion for summary judgment is now ripe for resolution.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(2); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## DISCUSSION

### I. Discrimination and Retaliation Claims

#### A. The McDonnell Douglas Framework

The Court considers Antrum's claims of intentional discrimination and retaliation under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The first step in the analysis requires a plaintiff to carry the burden of establishing a prima facie case by a preponderance of the evidence. Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). In order to make out a prima facie case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999)). To establish a prima facie case of retaliation, a plaintiff must establish: "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009); Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007). Under the Supreme Court's decision in Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006), a materially adverse action in the retaliation context is one that could conceivably dissuade a reasonable worker from making or supporting a charge of discrimination. See also Velikonja v. Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006); Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's burden, however, is merely one of production. Burdine, 450 U.S. at

254-55. The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

Where assessment of the employer's legitimate, non-discriminatory reason becomes necessary, a prolonged evaluation of the sufficiency of plaintiff's prima facie case is unnecessary, for the central inquiry then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." See Adeyemi v. Dist. of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008); see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 511 (1993), and U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-16 (1983)). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors . . . includ[ing] the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000); accord Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also Waterhouse v. Dist. of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002). In other words, the McDonnell Douglas shifting burdens framework effectively evaporates -- the sole remaining issue is discrimination or retaliation vel non, and "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

### B. Disparate Treatment Discrimination

Antrum contends that WMATA intentionally discriminated against him on the basis of his race when it ordered him to shave. Compl. ¶¶ 12, 17, 27-28. In response, WMATA offers a legitimate, non-discriminatory reason for requiring Antrum to shave: MTP General Order No. SPO-225 requires that all SPOs remain clean shaven, except for a mustache, unless they have been diagnosed by a dermatologist with PFB. General Order No. SPO-225, at 1-2. To survive summary judgment, Antrum must present evidence to show that defendant's explanation is a pretext for discrimination. See Brady, 520 F.3d at 494. He has not done so.

Antrum has not presented a single argument or piece of evidence that WMATA (or MTP specifically) enforced General Order No. SPO-225 on account of Antrum's race, nor has he supplied any other evidence suggesting racial hostility was the basis for defendant's actions. As this Circuit observed in Brown v. D.C. Transit System, Inc., 523 F.2d 725 (D.C. Cir. 1975), "the requirement[s] of hirsute conformity applicable to whites and blacks alike . . . are simply non-discriminatory conditions of employment falling within the ambit of managerial decision to promote the best interests of its business." Id. at 728 (dictum).[4] Here, the General Order is likewise facially neutral: it prohibits employees of all races from growing non-mustache facial hair except when the employee has a properly documented case of PFB. General Order No.

---

[4] In Brown, the D.C. Circuit addressed whether a stricter no-beard policy (providing for no exceptions) adopted by WMATA's predecessor violated the rights of African Americans under the Due Process Clause. See Brown, 523 F.2d at 726-29. In that context, the court observed that wearing a beard "is not a right protected by the Federal Government, by statute or otherwise, in a situation where a private employer has prescribed regulations governing the grooming of its employees while in that employer's service," and characterized the no-beard policy as a "non-discriminatory condition[] of employment." Id. at 728. To this extent, then, the D.C. Circuit has indicated that a facially neutral policy requiring transit employees to be clean-shaven is not racially discriminatory, although not expressly addressing the issue under Title VII.

SPO-225, at 1-2.[5] Moreover, once Antrum complied with the General Order by presenting his dermatologist's diagnosis of PFB to defendant, he was allowed to wear a beard. Hence, Antrum has not demonstrated pretext or, accordingly, that he was subject to disparate treatment discrimination.

To be sure, the EEOC reached a contrary conclusion, stating that "the evidence establishes reasonable cause to believe that [WMATA] has committed multiple violations of Title VII." EEOC Decision at 2. As a threshold matter, the EEOC findings do not have any binding effect in a collateral Title VII civil action. See Scott v. Johanns, 409 F.3d 466, 469 (D.C. Cir. 2005). More significantly, the EEOC's determination is so unpersuasive and conclusory that, even if it could properly be admitted into evidence,[6] no reasonably jury could find discrimination based on the EEOC decision. It consists, in essence, of a terse one-sentence determination that the General Order has a "significant statistical impact" on "Black males afflicted with PFB," with no explanation of the evidence supporting that finding and no description of the size of the statistical impact. See EEOC Decision at 2. The EEOC decision contains no other reasoning to conclude that defendant acted with discriminatory motive in requiring Antrum to comply with the General Order. Hence, it does not alter this Court's determination that no reasonable jury

---

[5] Antrum argues that defendant's reliance on General Order No. SPO-225 should not be credited because, notwithstanding the General Order's requirement of a dermatologist's diagnosis, defendant knows that PFB "afflicts Black males" and that plaintiff had PFB. Pl.'s Mem. at 9. In this regard, Antrum is actually challenging the allegedly negative impact of the General Order on African Americans. Antrum's disparate impact claim is addressed infra.

[6] Scott v. Johanns explains that administrative findings of liability are not "conclusive," but may be reviewed de novo in a judicial proceeding on Title VII liability. 409 F.3d at 470. A district court, however, should "inquire into the evidentiary basis of a final agency decision in determining whether it is sufficiently probative" to be admitted into evidence at trial in the federal civil action. See Bell v. Gonzales, Civil Action No. 03-0163, 2005 WL 3555490, at *3 (D.D.C. Dec. 23, 2005).

9

could find that, in enforcing the General Order, defendant subjected Antrum to disparate treatment based on his race.

## C. Retaliation

Antrum claims that WMATA retaliated against him for filing an EEOC charge of discrimination on July 11, 2005. See Pl.'s Mem. at 3; Pl.'s Decl. ¶ 10. Antrum alleges that this retaliation took the form of a "negative performance evaluation" on August 3, 2005, and a one-day suspension on May 1, 2006. Pl.'s Decl. ¶¶ 11-12.

A reasonable jury could not conclude, however, that Antrum's superiors retaliated against him in either action. With respect to the "negative performance evaluation," Antrum's retaliation claim fails because the evaluation does not constitute a "materially adverse" action. The comments at issue in the evaluation state that Antrum "is not in compliance with his professional appearance . . . [and] has been counseled on his Facial Hair growth." See Pl.'s Ex. 3, at 2. But "[i]n order for a performance evaluation to be materially adverse, it must affect the employee's 'position, grade level, salary, or promotion opportunities.'" Taylor v. Solis, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008)). Antrum has supplied no evidence that the comment in his evaluation caused him any harm. Indeed, he was ranked "competent" in the professional appearance category, received an overall rating of "competent," received positive written comments on his job performance, and was awarded a pay increase following the evaluation. Pl.'s Ex. 3, at 2, 6; Def.'s Ex. 6.[7]

Nor could a reasonable jury conclude that defendant retaliated against Antrum by

---

[7] Even if the comment amounted to a materially adverse action, Antrum has supplied no evidence from which a reasonable jury could find that its inclusion was motivated by retaliation. See Jones, 557 F.3d at 678. WMATA has supplied a legitimate reason for including the comment -- that Antrum violated MTP General Order No. SPO-225.

suspending him for one day. He fails to present evidence supporting an inference of a causal link between his protected EEO activity and the suspension. Antrum was suspended on May 1, 2006 -- over nine months after he filed his EEOC charge. Pl.'s Decl. ¶ 12. For temporal proximity to support an inference of retaliation, the events must be "very close." See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam). The D.C. Circuit has held that gaps much shorter than nine months are insufficient to support an inference of retaliatory motive. See, e.g., Taylor, 571 F.3d at 1322 ("[A]n inference of retaliatory motive based upon the 'mere proximity' . . . [of] two and one-half months . . . would be untenable . . . ."); Mayers v. Laborers' Health & Safety Fund of North America, 478 F.3d 364, 369 (D.C. Cir. 2007) ("Although causation can sometimes be inferred by temporal proximity, the eight- or nine-month gap [at issue] . . . is far too long" to support a causal connection) (citations omitted). Although ongoing EEO activity would be protected (see Holcomb v. Powell, 433 F. 3d 889, 903 (D.C. Cir. 2006)), Antrum has provided no evidence that he engaged in any EEO activity in the time between the filing of his initial EEO charge on July 11, 2005, and the date of his suspension over nine months later. Pl.'s Decl. ¶¶ 12-13.

But even assuming that the alleged temporal proximity could support an inference of a causal connection, WMATA has proffered a legitimate explanation for his suspension: the suspension was the result of an MTP investigation which found that Antrum had violated General Order No. SPO-225. Def.'s Ex. 7, at 1-2. The record is uncontroverted that Antrum did, in fact, violate the General Order and that he did so with full knowledge of the General Order. Antrum's only rebuttal is that defendant's proffered reason is unworthy of credence because WMATA had actual knowledge of his PFB condition through the nurse's diagnosis. See Pl.'s Mem. at 9. This is insufficient to establish pretext because, under the plain language of the

11

General Order, an employee's PFB condition must be supported by a "dermatologist" diagnosis to qualify for the PFB exception. See General Order No. SPO-225 at 1. Antrum acknowledges that he was fully aware of that requirement almost a year before the investigation and suspension took place. See Pl.'s Decl. ¶ 8 ("On or about July 1, 2005, I brought my medical certification [the nurse's PFB diagnosis] to Defendant's medical office but it was rejected because it was not from a Dermatologist."). Because Antrum fails to present any evidence that his EEO activity is causally linked to his suspension, or evidence that WMATA's explanation is pretextual, a reasonable jury could not conclude that the one-day suspension of Antrum in May 2006 was retaliation for engaging in EEO activity in July 2005.

## II.     Disparate Impact

Antrum alleges that WMATA has "engaged in a pattern or practice of discrimination against Black males," citing the EEOC's determination that the General Order has a "significant negative adverse impact on Black males with PFB." See Compl. ¶¶ 4, 17; see also Pl.'s Mem. at 7 ("The EEOC Determination points out that '[i]t is well established that employment policies or practices of a no-beard or facial hair [sic] results in a significant statistical impact based on race against Black males afflicted with PFB.'"). Hence, the Court interprets Antrum's complaint to allege a disparate impact claim, separate from his claim of intentional disparate treatment.

Unlike disparate treatment discrimination claims, disparate impact claims do not require proof of discriminatory motive and "'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). Disparate impact claims require the plaintiff first to establish a prima facie case that "policies or practices . . . neutral on their face and in intent . . . nonetheless discriminate in effect against a

12

particular group." Id. at 339. If so, the defendant must then "'demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.'" Id. (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(I)). Finally, if the defendant meets this burden, the plaintiff "must be given an opportunity to demonstrate that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect." Id. (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii)). It is the first part of this analytical framework that is determinative here.

WMATA moves for summary judgment on the disparate impact claim on the ground that plaintiff has failed to produce evidence that PFB disproportionately affects African American males and, thus, has failed to prove that the General Order has had a disproportionate negative impact on its African American employees. See Def.'s Mem. at 5; Def.'s Reply at 7-9. In response, plaintiff offers no statistical or other empirical case, but instead points only to the EEOC decision as evidence that the policy has a "significant statistical impact on Black males with PFB." See Pl.'s Mem. at 7. The EEOC decision, however, is not sufficient to establish a prima facie case of disparate impact because, as discussed earlier, it fails to cite to any evidence supporting its conclusion, and does not even discuss the size of any statistical impact. See EEOC Decision at 1-2. It simply states a conclusion, with scant reasoning and no support, and as non-binding precedent is therefore entitled to little weight. Because Antrum has failed to come forward with <u>evidence</u> establishing a prima facie case of disparate impact, WMATA is entitled to summary judgment on this claim. See EEOC v. Greyhound Lines, Inc., 635 F.2d 188, 192 (3d Cir. 1980) (holding that "no violation of Title VII can be grounded on the disparate impact theory without proof that the questioned policy or practice has had a disproportionate impact on the employer's workforce," and rejecting plaintiffs' challenge to an employer's "facially neutral no-beard job qualification policy" where plaintiffs with PFB failed to provide such proof).

Even accepting that PFB predominantly occurs among African-Americans, Antrum cannot demonstrate that African-Americans suffer a disparate impact under General Order No. SPO-225. In contrast to the situation in <u>Greyhound Lines</u>, WMATA does not have a rigid no-beard rule. General Order No. SPO-225 specifically permits individuals with PFB to grow beards, so long as they obtain documentation of their PFB from a dermatologist. It is that policy with its exception that must be assessed. Antrum essentially urges that WMATA has discriminated against African-Americans by granting those affected by PFB a special exception -- a special <u>benefit</u> as WMATA points out. <u>See</u> Def.'s Reply at 9 (if "the PFB exception . . . predominately affects Black men . . . , the exception grants an option to Black men not available to men of other races"). At their core, disparate impact claims require disparate <u>negative</u> impact -- a showing that an employer's challenged practice or rule, although facially neutral, "fall[s] more harshly on one group than another." <u>See</u> <u>Anderson</u>, 180 F.3d at 403. Here, Antrum has not demonstrated that being allowed to wear a beard once proper medical approval is acquired -- a special exception for those diagnosed with PFB -- constitutes a disparate <u>negative</u> impact under Title VII.

## **CONCLUSION**

For the foregoing reasons, the Court will grant WMATA's motion for summary judgment on Counts 1 and 3. This results in the final resolution of all counts of the complaint. Hence, the Court will vacate the pretrial conference and trial dates. A separate Order accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated:  May 10, 2010